**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:
Robert P. Young, Jr.    Michael F. Cavanagh
                        Marilyn Kelly
                        Stephen J. Markman
                        Diane M. Hathaway
                        Mary Beth Kelly
                        Brian K. Zahra

FILED JULY 30, 2012

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                                      No. 141932

JEROME WALTER KOWALSKI,

      Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

MARY BETH KELLY, J.

This case requires that we determine whether expert witness testimony regarding interrogation techniques and psychological factors claimed to generate false confessions is admissible under MRE 702 and MRE 403 and whether exclusion of this testimony violates the Sixth Amendment right to present a defense. The circuit court excluded the testimony of two experts regarding the occurrence of false confessions and the police interrogation techniques likely to generate them as well as the psychological characteristics of defendant that allegedly made him more susceptible to these techniques.

We hold that the circuit court did not abuse its discretion by excluding the expert testimony regarding the published literature on false confessions and police interrogations on the basis of its determination that the testimony was not reliable, even though the subject of the proposed testimony is beyond the common knowledge of the average juror. We also hold, however, that the circuit court abused its discretion by excluding the proffered testimony regarding defendant's psychological characteristics because it failed to consider this evidence separately from the properly excluded general expert testimony and therefore failed to properly apply both MRE 702 and MRE 403 to that evidence. Accordingly, we remand this case to the circuit court for it to determine whether evidence of defendant's psychological characteristics is sufficiently reliable for admissibility under MRE 702. We further hold that the circuit court's application of MRE 702 did not violate defendant's constitutional right to present a defense.

## I. FACTS AND PROCEDURAL HISTORY

In May 2008, the brother and sister-in-law of defendant, Jerome Walter Kowalski, were found dead in their home. Defendant was charged with both murders. Testimony elicited at defendant's preliminary examination and *Walker*[1] hearing indicates that police questioned defendant about the killings four times over the course of several days: first at defendant's home, next at the Brighton Police Station, then at the Ann Arbor Police Department, and finally at a Michigan State Police post.

During the third interview session, defendant acquiesced to the interviewer's statement that there was a "fifty percent chance [he killed his brother], but a fifty percent

---

[1] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

chance [he] didn't." Defendant discussed having a "blackout" and "blurred" memory and stated, "I thought I had a dream Thursday, but it was the actual shooting."

Defendant confessed to the murders during the last interview session, which followed a night in jail. Defendant stated that he went to his brother's home, walked into the kitchen, and murdered his brother and sister-in-law after a brief verbal exchange. The record suggests that defendant initially described shooting his brother in the chest from a distance of several feet, although he eventually changed his account after a detective illustrated through role-playing that defendant's first version of events did not corroborate the evidence recovered from the victims' house. At this point in the pretrial proceedings, defendant's confession is the primary evidence implicating him in the murders.

Before trial, defendant filed a motion to suppress his statements to the police, which the circuit court denied after conducting a *Walker* hearing. Defendant then filed a notice of intent to call two expert witnesses. Dr. Richard Leo, a social psychologist, would testify regarding police interrogation techniques and the existence of false confessions. Dr. Jeffrey Wendt, a clinical and forensic psychologist, proposed to testify about the psychological testing he performed on defendant and offer his opinion about defendant's mental state during police questioning. Wendt would also offer testimony that the "circumstances of Mr. Kowalski's confession were consistent with the literature on false confessions" and that the interaction between defendant and police "was consistent with a coerced internalized confession."

3

The prosecutor moved to exclude this proposed expert testimony, arguing that it was inadmissible under MRE 702. Both experts testified at a *Daubert*[2] hearing. Leo explained that his research classified each confession he believed to be false as either a "proven false" confession, a "highly probable false" confession, or a "probable false" confession.[3] This categorization involved comparing the narrative of a defendant's confession with other evidence, checking whether the confession led to independent evidence, and looking for other indicia of reliability, with a researcher determining whether the confession fell into one of the three categories of false confessions.[4] While some of the facts involved in this analysis came "directly from case files," many were gleaned from secondary sources, including popular media accounts.[5] In addition to

---

[2] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

[3] Leo's research classifies a confession as "proven false" if "it can be objectively established that the suspect confessed to a crime that did not happen," that "the defendant could not have committed the crime," that "the true perpetrator of a crime is identified and his guilt can be objectively established," or that "scientific evidence—in recent years, most commonly DNA evidence—dispositively establishes the false confessor's innocence." Drizin & Leo, *The problem of false confessions in the post-DNA world*, 82 NC L R 891, 925-926 (2004). Confessions are classified as "highly probable false" if the researchers are satisfied that the confessor's innocence was established "beyond a reasonable doubt" and "probable false" if the researchers are satisfied the confessor's innocence was established only by a "preponderance of the evidence." Leo & Ofshe, *The consequences of false confessions: Deprivations of liberty and miscarriages of justice in the age of psychological interrogation*, 88 J Crim L & Criminology 429, 436-437 (1998).

[4] *Id*. at 438-440.

[5] See *id*. at 456 n 199, 457 n 203, 459 n 225, and 461 n 243, citing *Eye To Eye with Connie Chung: Confession* (CBS News Television Broadcast, January 13, 1994); *Page Free After Doing 2 1/2 Years for 1984 Killing of His Girlfriend*, SF Examiner, February 11, 1995, p A5; Carolyn Colwell, *Tankleff's Family: Jury Goofed Relatives Say "Poker*

4

classifying confessions by his confidence in their falsity, Leo also classified confessions as "voluntary false confessions," "stress-compliant false confessions," "coerced-compliant false confessions," "coerced-persuaded false confessions," or "non-coerced-persuaded false confessions."[6] Leo categorized each confession in this manner by comparing the circumstances of each confession with those of other confessions he had already determined to be false.

On the basis of this research, Leo proposed to testify that "false confessions are associated with certain police interrogation techniques," that "some of those interrogation techniques were used in this case," and that "risk factors associated with false and unreliable confessions, especially persuaded false confessions, were [also] present in this case." In support of Leo's opinions, defendant offered research conducted by Leo and by

---

*Face" Hurt Teen in Murder Trial*, Newsday, July 3, 1990, p 6; *60 Minutes: Richard Lapointe: Did He Do It?* (CBS News Television Broadcast, June 30, 1996).

[6] Leo's research classifies a confession as a "voluntary false confession" when offered "either without police interrogation or in response to minimal police pressure." Leo, *False Confessions: Causes, Consequences, and Solutions*, in Westervelt & Humphrey, eds, *Wrongly Convicted: Perspectives on Failed Justice* (New Jersey: Rutgers University Press, 2001), ch 2, p 42. Confessions are classified as "stress-compliant false confessions" when "the stresses and pressures of custodial questioning overwhelm the suspect and she comes to believe that the only way to terminate the punishing experience of interrogation is by confessing." *Id.* Confessions are classified as "coerced-compliant false confessions" when "'a suspect confesses in order to escape or avoid an aversive interrogation or to gain a promised reward.'" *Id.* at 43 (citation omitted). Confessions are classified at as "coerced-persuaded false confessions" when "the interrogator's use of coercive influence techniques causes [the confessor] to temporarily doubt the reliability of his memory; believe that he probably did, or logically must have, committed the crime under question; and confess to it, despite having no memory or knowledge of participating in or committing the offense. *Id.* "Non-coerced-persuaded false confessions" are similar to coerced-persuaded false confessions but "[are] not elicited in response to coercive interrogation techniques." *Id.* at 44.

5

others.  Some of this research appeared in peer-reviewed scientific journals, while some appeared in law reviews, which are not peer-reviewed.

Next, Wendt testified that he had administered a battery of standard psychological tests on defendant, performed an extensive clinical interview of defendant, and reviewed both the police reports recounting the circumstances of defendant's police interrogation as well as the transcripts of those interrogations.[7]  Wendt testified that these types of data are routinely used at the Center for Forensic Psychiatry.[8]  Wendt then combined all these "data sources" to form a psychological profile, which allowed him to discuss how defendant's traits affected his ability to interact with other people.[9]  Lastly, Wendt proposed to testify that "[t]he circumstances of [defendant's] confession were consistent with the literature on false confessions" and that the interaction between defendant and the police "was consistent with a coerced internalized confession."[10]

---

[7] The battery of tests included the Personality Assessment Inventory, the Minnesota Multiphasic Personality Inventory, and the Substance Abuse Subtle Screening Inventory.

[8] The Center for Forensic Psychiatry, located outside Ann Arbor, hosts Michigan's only certified forensic facility and conducts all competency and criminal responsibility evaluations ordered in Michigan criminal proceedings.

[9] Specifically, Wendt stated that defendant's

> lack of interpersonal strength or drive leaves him vulnerable to being influenced by others. . . .  The combination of his, of his cognitive factors in terms of his anxiety and depression; his interpersonal factors, in terms of his, low assertiveness, leave him particularly vulnerable to suggestion by others and influence by others, particularly people who are in positions of authority.

[10] The literature uses the terms "coerced internalized confession" and "coerced-persuaded false confession" interchangeably.

At the conclusion of the hearing, the circuit court excluded both experts' proposed testimony. The circuit court ruled that Leo was qualified in terms of knowledge but that his testimony was unreliable and would not assist the trier of fact. The circuit court stated that "the lack of precise information" precluded Leo from measuring the accuracy of his studies and also critiqued the sources underlying Leo's classifications of particular confessions as false:

> [Leo] doesn't . . . have the ability in his studies to review video tapes, which would be reliable. He relies on newspaper accounts, magazine articles. He relies on information provided from sources that are prejudice[d], for example a defense attorney that represented a defendant, [and] advocates against the death penalty. . . . I don't understand why he couldn't have done a [Freedom of Information Act request], police agency files where confessions were given and the suspect was tried or not tried, pull court files, order transcripts, review police records. . . . [This] would be a . . . more reliable methodology.

The circuit court examined the manner in which Leo analyzed the confessions that he determined to be false:

> [Leo] starts with the conclusion that the confession is false and then he works backwards. . . . He doesn't take into consideration why someone might falsely confess, other than because of a police interrogation technique. . . . [A]nd there are reasons why people would falsely confess, they might be trying to protect someone . . . . He hasn't determined a reliable means to have a study group consist of innocent people who wrongfully confess that weren't mentally ill or youth.

The circuit court criticized this methodology for failing to compare true and false confessions and identify factors that contribute to false confessions but not true confessions. As the circuit court stated, "[I]f true and false confessions can be derived from the same police interrogation techniques, [how] is it possible to blame police interrogation techniques with any degree of reliability?" Given what the circuit court

7

considered to be inadequacies of Leo's data and methodology, the circuit court concluded that Leo's testimony was unreliable.

The circuit court further determined that Leo's testimony would not assist the trier of fact because the jury could evaluate the credibility and reliability of defendant's confession in other ways:

> The video tape will allow the jury to have a first hand view of exactly how the confession was elicited. The jurors will be able to view the police interrogation techniques used. The jury can determine credibility and determine whether the confession is reliable. They have a video. The jurors can figure out if it's a persuaded confession by reviewing the tape and considering if the defendant was able to give facts to the police officer regarding the crime.

Accordingly, the circuit court ruled that Leo's testimony failed to comply with MRE 702.

Finally, the circuit court concluded that Leo's testimony was also properly excluded under MRE 403. The circuit court ruled that the "highly questionable" probative value of Leo's testimony was outweighed by the danger of unfair prejudice because the jury would hear about confessions of defendants with characteristics not present in this case, such as mental illness and youth, and because Leo would describe some confessions as "proven false" when the data did not support that conclusion.

With regard to Wendt's testimony, the circuit court found that the exclusion of Leo's testimony regarding the phenomenon of false confessions also required the exclusion of Wendt's testimony:

> With no other evidence about false confessions, I don't see how this could be relevant, helpful or do anything other than be misleading. . . . What does that do in this case, other than result in misleading evidence, irrelevant evidence, or at least, that probative value would be substantially outweighed by the danger of unfair prejudice.

Defendant sought interlocutory leave to appeal the circuit court's decision excluding the expert testimony. The Court of Appeals stayed the circuit court proceedings, but ultimately affirmed the circuit court in a split decision.[11] The Court of Appeals majority agreed with the circuit court that Leo's testimony would have been unhelpful because it "would not have involved a proposition that was outside the common knowledge of a layperson."[12] The Court of Appeals concluded that the circuit court's reliability determination was not an abuse of discretion, reasoning that Leo had used subjective determinations of which confessions were false, that his methodology could not be subjected to testing, and that no rate of error could be quantified.[13] The Court of Appeals also concluded that the circuit court did not abuse its discretion by determining that Wendt's testimony would not have assisted the trier of fact. The Court of Appeals explained that this testimony related to witness credibility, which is within the sole province of the jury, and that Wendt could not distinguish the characteristics of a person who makes a false confession from the characteristics of a person who makes a true confession.[14] The Court of Appeals agreed with the circuit court that the danger of unfair prejudice outweighed the probative value of the testimony of both witnesses and that their testimony was inadmissible under MRE 403, reasoning that an opinion on the

---

[11] *People v Kowalski*, unpublished opinion per curiam of the Court of Appeals, issued August 26, 2010 (Docket No. 294054).

[12] *Id*. at 3.

[13] *Id.* at 4.

[14] *Id*. at 5.

9

truthfulness of defendant's confession was implicit in the testimony.[15] Finally, the Court of Appeals rejected defendant's claim that the circuit court had violated his constitutional right to present a defense, explaining that "this right is not absolute: the accused must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."[16]

The Court of Appeals partial dissent would have reversed the circuit court's decision with respect to Leo's testimony regarding "the general fact of false confessions" and with respect to Wendt's testimony to the extent it could stand independently of Leo's.[17] The dissent discussed empirical evidence that jurors "were commonly skeptical of false confessions" and claimed that the majority made "assumptions . . . as to what a layperson may or may not commonly know."[18] The dissent also concluded that Wendt's testimony "that defendant's personality makes him more susceptible to influence than normal is based on reliable methodologies and is highly relevant to explain his mental state as a circumstance attendant to his confession."[19]

Defendant applied for leave to appeal in this Court. We granted leave and instructed the parties to address

---

[15] *Id.*

[16] *Id.* at 3 (quotation marks and citations omitted).

[17] *Id.* at 1-2 (DAVIS, J., concurring in part and dissenting in part).

[18] *Id.* at 2.

[19] *Id.* at 1.

(1) whether the defendant's proffered expert testimony regarding the existence of false confessions, and the interrogation techniques and psychological factors that tend to generate false confessions, is admissible under MRE 702; (2) whether the probative value of the proffered expert testimony is substantially outweighed by the danger of unfair prejudice; and (3) whether the Livingston Circuit Court's order excluding the defendant's proffered expert testimony denies the defendant his constitutional right to present a defense.[20]

## II. STANDARD OF REVIEW

This Court reviews for an abuse of discretion a circuit court's decision to admit or exclude evidence.[21] An abuse of discretion results when a circuit court selects an outcome falling outside the range of principled outcomes.[22] We review de novo constitutional questions and issues of law underlying evidentiary rulings.[23]

## III. ANALYSIS

### A. MRE 702

MRE 702 establishes prerequisites for the admission of expert witness testimony.[24] The rule provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data,

---

[20] *People v Kowalski*, 489 Mich 858 (2011).

[21] *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010).

[22] *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

[23] *Dep't of Transp v Haggerty Corridor Partners Ltd Partnership*, 473 Mich 124, 134; 700 NW2d 380 (2005); *People v McCuller*, 479 Mich 672, 681; 739 NW2d 563 (2007).

[24] *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782, 789; 685 NW2d 391 (2004).

11

(2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

A court considering whether to admit expert testimony under MRE 702 acts as a gatekeeper and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable.[25] The overarching goal is "to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[26] Because there are many different kinds of experts and expertise, this inquiry is, by necessity, a flexible one, and a court determining the admissibility of expert testimony may consider reliability factors pertinent to the particular type of expert testimony offered and its connection to the particular facts of the case.[27]

Whatever the pertinent factors may be, however, a court evaluating proposed expert testimony must ensure that the testimony (1) will assist the trier of fact to understand a fact in issue, (2) is provided by an expert qualified in the relevant field of knowledge, and (3) is based on reliable data, principles, and methodologies that are applied reliably to the facts of the case.[28] Although these considerations are separate and

---

[25] *Daubert*, 509 US at 589.

[26] *Kumho Tire Co, Ltd v Carmichael*, 526 US 137, 152; 119 S Ct 1167; 143 L Ed 2d 238 (1999).

[27] *Daubert*, 509 US at 594-595; *Kumho Tire Co*, 526 US at 149-151 (explaining that a court has considerable leeway in how to decide whether expert testimony is reliable in a particular case depending on the nature of the issue, the expert's expertise, and the subject of the testimony).

[28] MRE 702.

distinct and must each be satisfied independently, they are, in fact, overlapping in nature. For example, "[a]n expert who lacks 'knowledge' in the field at issue cannot 'assist the trier of fact.'"[29] Likewise, expert testimony without a credible foundation of scientific data, principles, and methodologies is unreliable and, thus, unhelpful to the trier of fact.[30] Indeed, proposed expert testimony must meet all the other requirements of MRE 702 in order to "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ."

However, the threshold inquiry—whether the proposed expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue"—is also not satisfied if the proffered testimony is not relevant or does not involve a matter that is beyond the common understanding of the average juror. Interpreting the nearly identical language in the federal counterpart to MRE 702,[31] the United States Supreme Court explained that helping the trier of fact to "understand the evidence or to determine a fact in issue" presents a question of relevance because "'[e]xpert testimony which does not

---

[29] *Gilbert*, 470 Mich at 789.

[30] *Id*. at 790, quoting *Zuzula v ABB Power T & D Co, Inc*, 267 F Supp 2d 703, 711 (ED Mich, 2003).

[31] FRE 702 stated before its amendment, effective December 1, 2011:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

relate to any issue in the case is not relevant and, ergo, non-helpful.'"[32]  Similarly, if the average juror does not need the aid of expert interpretation to understand a fact at issue, then the proffered testimony is not admissible because "it merely deals with a proposition that is not beyond the ken of common knowledge."[33]  These considerations of relevancy and the need for expertise are independent of the other requirements of MRE 702.  Thus, even proposed expert testimony that is offered by a qualified expert and based on reliable scientific data and methods may be properly excluded if it is not relevant to the facts of the case or is offered for a proposition that does not require the aid of expert interpretation.

In this case, the Court of Appeals affirmed the circuit court's exclusion of the expert testimony primarily because, in its view, the expert testimony about false confessions "would not have involved a proposition that was outside the common

---

[32] *Daubert*, 509 US at 591, quoting 3 Weinstein & Burger, Weinstein's Evidence, ¶ 702[02], p 702-18.  As applied in this case, this threshold determination of relevance has been met, since defendant claims that his confession, the primary evidence tying him to the murders, was a false confession of the type that Leo and Wendt study.

[33] *Gilbert*, 470 Mich at 790, quoting *Zuzula*, 267 F Supp 2d at 711.  The original Note of the Advisory Committee to FRE 702 recognizes this same principle:

> "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."  Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952).  When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time.  7 Wigmore[, Evidence] §1918.

14

knowledge of a layperson."[34]   Thus, we first address whether testimony regarding the phenomenon of false confessions is beyond the factfinder's "ken of common knowledge" before proceeding to the lower courts' application of the additional requirements of MRE 702.

## B.  FALSE-CONFESSION TESTIMONY AND THE "BEYOND COMMON KNOWLEDGE" REQUIREMENT

As we have explained, whether expert testimony is beyond the ken of common knowledge is a commonsense inquiry that focuses on whether the proposed expert testimony is on a matter that would be commonly understood by the average person.[35]  If "the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute," then expert testimony is unnecessary.[36]

---

[34] *Kowalski*, unpub op at 3.

[35] See, e.g., *Berry v Detroit*, 25 F3d 1342, 1350 (CA 6, 1994) ("If everyone knows [the proposition the expert would testify to], then we do not need an expert because the testimony will not 'assist the trier of fact to understand the evidence or to determine a fact in issue . . . .'"), quoting former FRE 702.

[36] See Note to former FRE 702 as quoted in note 33 of this opinion; see also *Kumho Tire*, 526 US at 149 (noting that expert testimony rests "'upon an experience confessedly foreign in kind to [the jury's] own'"), quoting Hand, *Historical and practical considerations regarding expert testimony*, 15 Harv L R 40, 54 (1901).  As Judge Learned Hand explained, "The whole object of the expert is to tell the jury . . . general truths derived from his specialized experience. . . .  It is just because [the jurors] are incompetent for such a task that the expert is necessary at all."  Hand, 15 Harv L R at 54.

15

Although we have not considered whether the aid of expertise may help a juror to understand the occurrence of false confessions, we have allowed experts to explain other human behavior that is contrary to the average person's commonsense assumptions. In *People v Peterson*, for example, we observed that victims of child sexual abuse sometimes exhibit behavior, such as delayed reporting of abuse or retraction of accusations, that psychologists understand to be common among abuse victims but that jurors might interpret as being inconsistent with abuse.[37] We held that if the victim's credibility is attacked by highlighting this behavior, then a qualified expert may explain the consistencies between the behavior of that victim and that of other victims of child sexual abuse. We further explained that such testimony was helpful to address "behavioral traits that may, by their very nature, create confusion in the minds of the jury."[38]

Likewise, in *People v Christel*, we observed that expert testimony is needed when a "witness'[s] actions or responses are incomprehensible to average people."[39] Thus, we permitted a prosecution expert to testify about battered woman syndrome and how a victim of domestic violence might "deny, repress, or minimize the abuse . . . ."[40] We

---

[37] *People v Peterson*, 450 Mich 349, 363; 537 NW2d 857 (1995).

[38] *Id.* at 375.

[39] *People v Christel*, 449 Mich 578, 592; 537 NW2d 194 (1995).

[40] *Id.* at 585.

held that this type of testimony was "relevant and helpful when needed to explain a complainant's actions . . . ."[41]

The common theme in these cases is that certain groups of people are known to exhibit types of behavior that are contrary to common sense and are not within the average person's understanding of human behavior. In these instances, an expert's specialized testimony may enlighten the jury so that it can intelligently evaluate an experience that is otherwise foreign.

Although we have not recognized that making a purported false confession constitutes behavior contrary to common sense, the Court of Appeals did so in *People v Hamilton*.[42] In that case, the defendant was charged with felony-murder and other crimes based solely on a confession he had made to the police. The defense theory was that the defendant had not committed the crimes and had falsely confessed. In support, the defendant proffered testimony of a clinical psychologist who would have testified "how defendant's psychological makeup might have affected his statements to the police."[43]

---

[41] *Id*. at 580.

[42] *People v Hamilton*, 163 Mich App 661; 415 NW2d 653 (1987). Multiple federal circuits have acknowledged, at least implicitly, that the average person does not understand why a defendant would make false inculpatory statements and have permitted the admission of expert testimony bearing on factors that could lead to a false confession. See *United States v Roark*, 753 F2d 991, 994-995 (CA 11, 1985) (holding admissible under FRE 702 "testimony . . . designed to help the trier of fact determine whether it was more or less probable that [the defendant] was somehow psychologically coerced into [confessing]"); *United States v Shay*, 57 F3d 126, 134 (CA 1, 1995) (holding that the district court erred by excluding expert testimony pertaining to the defendant's "mental disorder that caused him to make false statements" because such testimony is contrary to the commonsense assumption that individuals do not falsely confess).

[43] *Hamilton*, 163 Mich App at 663.

17

The Court of Appeals, citing *Crane v Kentucky*,[44] recognized that a rational juror does not readily understand why a defendant who is innocent might confess to a crime and that expert testimony regarding a defendant's psychological makeup might be relevant to a confession's reliability and credibility. The Court of Appeals, therefore, reversed the lower court's exclusion of the evidence, explaining:

> [E]vidence of the manner in which a confession was obtained may be highly relevant to the confession's reliability and credibility . . . .
>
> \* \* \*
>
> [The proffered testimony] would help the jury understand the circumstances surrounding defendant's statements to the police and how those circumstances affected the reliability and credibility of defendant's statements. Such an understanding is central to the jury's determination of defendant's guilt or innocence.[45]

We agree with *Hamilton* that expert testimony bearing on the manner in which a confession is obtained and how a defendant's psychological makeup may have affected the defendant's statements is beyond the understanding of the average juror and may be relevant to the reliability and credibility of a confession.[46]

---

[44] *Crane v Kentucky*, 476 US 683, 688-690; 106 S Ct 2142; 90 L Ed 2d 636 (1986).

[45] *Hamilton*, 163 Mich App at 666-667.

[46] The circuit court and Court of Appeals, like the dissent, distinguished *Hamilton*, in part, on the ground that it was decided before MRE 702 incorporated the *Daubert* standards. The Court of Appeals reasoned that under earlier MRE 702 analysis, "the trial court was not required to make a 'searching inquiry' into the reliability of the proffered expert's testimony by analyzing the expert's methodologies and principles." *Kowalski*, unpub op at 6. However, *Hamilton*'s reasoning regarding whether expert testimony was beyond the average person's common knowledge was unchanged by *Daubert* and is still instructive on that point. We address the issue of reliability separately.

18

In the instant case, however, the Court of Appeals, like the circuit court, held that the proffered testimony about false confessions "would not have involved a proposition that was outside the common knowledge of a layperson"[47] because the jury could perform its own analysis of defendant's inculpatory statements. Certainly, we have no disagreement with the premise that issues involving credibility and the weight of the evidence are within the province of the jury. However, the Court of Appeals' analysis wrongly focused on the jury's role, which is not part of the MRE 702 analysis, rather than on what knowledge the common person possesses and whether the aid of specialized knowledge can help a juror understand a fact at issue. Like the behavior of the child sexual abuse and domestic violence victims in *Peterson* and *Christel*, a purported false confession of the sort in *Hamilton* constitutes counterintuitive behavior that is not within the ordinary person's common understanding, and thus expert assistance can help jurors understand how and why a defendant might confess falsely.[48] The exclusion of such

---

[47] *Kowalski*, unpub op at 3.

[48] The dissent attempts to diminish the significance of *Peterson* and *Christel* by suggesting that they do not support our holding, in part because they were decided before the amendment of MRE 702 to conform to *Daubert*. The amendment, however, is irrelevant because it did not affect the inquiry whether expert testimony is beyond the average person's common knowledge. The dissent further attempts to distinguish *Peterson* and *Christel* on the basis that the phenomenon of a false confession is a "commonplace circumstance[]" that jurors are well equipped to understand, unlike "the extraordinary relationships of the sexually abused child and the battered woman . . . ." *Post* at 19. However, this assertion unreasonably assumes that the ordinary juror has the "life's experience to comprehend," *post* at 19, the circumstances of police interrogation—circumstances typically experienced only by those accused of criminal conduct—and the effect of a defendant's particular psychological traits on the outcome of the interrogation. The distinctions drawn by the dissent are therefore unavailing.

expert testimony when it meets all the requirements of our evidentiary rules could, in some instances, hinder the jury in its task because without the enlightenment of expert opinion the jury's ultimate determination may not be arrived at intelligently.

Our conclusion that a confession challenged as false constitutes behavior contrary to common sense finds additional support in a longstanding presumption deeply rooted in our country's legal system: A person does not ordinarily make untruthful incriminating statements. As the United States Supreme Court explained more than 100 years ago, confessions are given great weight on the basis of the presumption that "one who is innocent will not imperil his safety or prejudice his interests by an untrue statement . . . ."[49] Our "statement against interest" exception to the hearsay rule embodies this presumption and allows the admission of hearsay statements, which are typically considered untrustworthy, if the statement tended to subject the declarant to criminal liability, so "that a reasonable person . . . would not have made the statement unless believing it to be true."[50] The premise underlying this hearsay exception is "the

_____

[49] *Hopt v People of the Territory of Utah*, 110 US 574, 585; 4 S Ct 202; 28 L Ed 262 (1884); see also *Crane*, 476 US at 689 (recognizing that rational jurors attach credibility to a defendant's confession because an innocent defendant would not admit guilt).

[50] MRE 804(b)(3). This presumption is also embodied in the rules of evidence in many other states. See Alas R Evid 804(b)(3); Ariz R Evid 804(b)(3); Ark R Evid 804(b)(3); Cal Evid Code § 1230; Del R Evid 804(b)(3); Fla Stat 90.804(2)(c); Ga Code Ann 24-8-804(b)(3) (effective until January 1, 2013); Hawaii R Evid 804(b)(3); Idaho R Evid 804(b)(3); Iowa R Evid 5.804(b)(3); La Code Evid 804 (B)(3); Minn R Evid 804(b)(3); Miss R Evid 804(b)(3); Mont R Evid 804(b)(3); Neb Rev Stat 27-804(2)(c); Nev Rev Stat 51.345; NH R Evid 804(b)(3); NJ R Evid 803(c)(25); Okla Stat tit 12, § 2804(B)(3); Or Rev Stat 40.465(3)(c); RI R Evid 804(b)(3); SC R Evid 804(b)(3); SD Codified Laws 19-16-32; Tenn R Evid 804(b)(3); Vt R Evid 804(b)(3); W Va R Evid 804(b)(3); Wis Stat 908.045(4); Wyo R Evid 804(b)(3); see also *People v Ennis*, 11 NY3d 403, 413; 872 NYS2d 364; 900 NE2d 915 (2008) ("To qualify under [the declarations against penal

common-sense intuition that a reasonable person would be expected to lie, if at all, only in his own favor, and would not harm himself by his own words."[51] Despite this well-established, commonsense presumption, embodied in our evidentiary rules, that a person does not make false incriminating statements, both the Court of Appeals and the circuit court simply presumed that the average juror possessed the knowledge to evaluate factors that might lead to a false confession. This conclusion is not grounded in the necessary commonsense inquiry and lacks any legal basis.

Accordingly, we hold that because the claim of a false confession is beyond the common knowledge of the ordinary person, expert testimony about this phenomenon is admissible under MRE 702 when it meets the other requirements of MRE 702. We caution, however, that like other expert testimony explaining counterintuitive behavior, the admissibility of expert testimony pertaining to false confessions is not without limitations. An expert explaining the situational or psychological factors that might lead to a false confession may not "comment on the . . . truthfulness" of a defendant's confession,[52] "vouch for the veracity" of a defendant recanting a confession,[53] or "give an

---

interest exception to the hearsay rule], the declarant must be unavailable, must have competent knowledge of the facts and must have known at the time the statement was made that it was against his or her penal interests . . . ."); *State v Zerban*, 412 SW2d 397, 399-400 (Mo, 1967) ("[I]f he made any incriminating statements, untrue denials evincing a consciousness of guilt, they would constitute admissions against interest and be admissible in evidence.").

[51] *People v Watkins*, 438 Mich 627, 636; 475 NW2d 727 (1991).

[52] See *Christel*, 449 Mich at 580.

[53] See *Peterson*, 450 Mich at 352.

opinion as to whether defendant was telling the truth when he made the statements to the police."[54] These conventional limitations are necessary to guard against the potential for jurors to view the expert "not only as possessing specialized knowledge in terms of behavioral characteristics generally associated with the class of" defendants subject to police interrogation, but also as "possess[ing] some specialized knowledge for discerning the truth."[55] Given the availability of these conventional limitations, we—unlike the Court of Appeals, which viewed the expert testimony as tantamount to testimony that defendant's confession was false—are less pessimistic about the circuit court's management of the proposed testimony and the jury's capability to properly evaluate and assess the testimony in light of all the evidence submitted at trial.[56]

---

[54] See *Hamilton*, 163 Mich App at 669.

[55] *People v Beckley*, 434 Mich 691, 727-728; 456 NW2d 391 (1990) (opinion by BRICKLEY, J.). Additionally, and should the parties request it, a circuit court may provide, as an added safeguard against this potential danger, a limiting instruction directing the jury to consider the testimony only for its intended and limited purpose.

[56] The Court of Appeals concluded that an unavoidable inference would be drawn from the expert testimony that defendant falsely confessed or that the testimony would, at least, "directly [imply] that the police influenced [defendant] into making a false confession." *Kowalski*, unpub op at 6. The possibility that the jury might draw a particular conclusion from the expert testimony, or that a party might argue that a particular conclusion should be drawn from that testimony, does not mean that the expert himself is implying what conclusion should be drawn. Otherwise, we would have excluded the proposed expert testimony in *Peterson* and *Christel* on the grounds that the testimony itself would imply that the victims had, in fact, been abused. We rejected this argument in *Peterson* and *Christel* and we reject it again here.

The dissent also dismisses these safeguards as ineffective, claiming that an expert on false confessions is akin to a "human lie detector" whose testimony will almost certainly cause jurors to casually abandon their role of assessing witness credibility. *Post* at 14 (quotation marks and citation omitted). This analogy is inapt because the "aura of infallibility" surrounding polygraph evidence—which is derived from a physiological test

In this case, the proposed testimony of both experts regarding the phenomenon of false confessions and Wendt's testimony regarding defendant's psychological characteristics would explain a proposition that is beyond the ken of common knowledge. Thus, the lower courts erred to the extent that they excluded the evidence solely on the basis that it "merely deals with a proposition that is not beyond the ken of common knowledge."[57]

## C. ADDITIONAL REQUIREMENTS OF MRE 702

Our conclusion in this regard does not end our analysis. We must still consider the other requirements of MRE 702 before determining whether the circuit court's ultimate conclusion to exclude the proposed testimony amounted to an abuse of discretion. As we have explained, the testimony of Leo and Wendt is admissible under MRE 702 if it meets the other requirements of the evidentiary rule: the "witness [is] qualified as an expert by knowledge, skill, experience, training, or education," the "testimony is based on sufficient facts or data," the "testimony is the product of reliable principles and methods," and the "witness has applied the principles and methods reliably to the facts of the case."[58] When evaluating the reliability of a scientific theory or technique, courts

to determine whether a person is lying—is not attendant to experts testifying about the phenomenon of false confessions and defendants' psychological traits. *Post* at 14 (quotation marks and citation omitted). Further, we assume that "jurors are presumed to follow their instructions," *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998), and we must consider the extent to which a juror has the ability both to follow those instructions and to autonomously assess the credibility of the expert's testimony in light of all the other evidence produced at trial.

[57] *Gilbert*, 470 Mich at 790.

[58] MRE 702.

23

consider certain factors, including but not limited to whether the theory has been or can be tested, whether it has been published and peer-reviewed, its level of general acceptance, and its rate of error if known.[59] This analysis requires courts to ensure that "each aspect of an expert witness's proffered testimony—including the data underlying the expert's theories and the methodology by which the expert draws conclusions from that data—is reliable."[60]

Here, the expert testimony consists of two distinct categories: testimony by Leo and Wendt regarding the general phenomenon of false confessions and testimony by Wendt regarding his clinical psychological examination of defendant. We address each category in turn as it relates to the remaining requirements of MRE 702.

1. GENERAL TESTIMONY ABOUT FALSE CONFESSIONS

Both Leo and Wendt proposed to offer testimony based on research and literature about the phenomenon of false confessions. Leo proposed to testify that false confessions existed, that certain psychological interrogation techniques commonly employed by the police sometimes resulted in false confessions, and that some of those techniques were used in this case. Wendt proposed to build on this foundation and testify that "[t]he circumstances of [defendant's] confession were consistent with the literature

---

[59] *Daubert*, 509 US at 593-594. These factors are typically referred to as the "*Daubert* factors," but, as explained in note 27 of this opinion and the accompanying text, a court has great leeway to consider additional, or other, factors pertinent to the particular area of expertise. All the *Daubert* factors are pertinent in this case because, as in *Daubert*, the expert testimony pertains to scientific theories and techniques.

[60] *Gilbert*, 470 Mich at 779.

on false confessions" and that the interaction between defendant and the police "was consistent with a coerced internalized confession."

With regard to Leo, the circuit court followed the mandate of MRE 702 and carefully reviewed all the stages of Leo's research, starting with his data.[61] The circuit court noted that Leo decided whether a confession was false on the basis of information he gathered from sources such as newspaper accounts and attorneys representing the confessors. The circuit court questioned the accuracy and potential bias of these sources and even offered an alternative method of obtaining more authoritative documentation through Freedom of Information Act requests.

Next, the circuit court identified multiple problems with the analysis Leo applied to his data. Among the circuit court's observations was that Leo "starts with the conclusion that the confession is false and then he works backwards" to find commonalities. The circuit court concluded that, rather than yielding factors common to all false confessions, Leo's method seemed to yield only factors common to confessions Leo *believed* to be false. This also made it impossible to test Leo's research or compute its rate of error. The circuit court also noted that because Leo did not have a "reliable means to have a study group" that excluded extraneous factors, he had "no ability to estimate the frequency of false confessions." The circuit court found troubling the number of confessions in Leo's studies that involved factors not present in this case, such

_____

[61] The parties do not dispute the circuit court's ruling that Leo is qualified as an expert in this field.

as a defendant's youth or mental incapacity. Finally, the circuit court was troubled by a lack of "a random sample of confessions, true and false."

Nothing in the circuit court's analysis placed the exclusion of Leo's testimony outside the range of principled outcomes.[62] The circuit court properly considered all stages of Leo's analysis and found it unreliable at every stage. With regard to the data underlying Leo's testimony, the circuit court reasonably determined that its sources were unreliable because they were prone to inaccuracy or bias and, in nearly all instances, had not been subjected to the rigorous standards of scientific peer-review. Additionally, the circuit court raised multiple legitimate concerns about the "manner in which [Leo] interpret[ed] and extrapolate[d] from those data." The unreliable methodology, as the circuit court described, resulted in conclusions consistent with Leo's own preconceived beliefs rather than testable results consistent with an objective, scientific process. Therefore, because the exclusion of Leo's testimony was a reasonable and principled outcome, the circuit court's decision did not amount to an abuse of discretion. The Court of Appeals came to the same conclusion after making similar observations about the data and methods underlying Leo's studies, and we thus affirm the lower courts' decisions to exclude Leo's testimony.[63]

---

[62] *Babcock*, 469 Mich at 269.

[63] The dissent would also exclude Leo's testimony under MRE 403. Because we have concluded that the circuit court did not abuse its discretion by excluding Leo's testimony under MRE 702, we need not examine whether MRE 403 also allows for the testimony's exclusion.

Further, because the circuit court and Court of Appeals properly excluded Leo's testimony pertaining to the literature of false confessions, they were also correct to exclude the portion of Wendt's testimony indicating that defendant's confession was consistent with this literature.[64] This part of Wendt's testimony obviously relied on the same unreliable foundation that we have rejected with respect to Leo's testimony. Thus, we cannot conclude that the lower courts committed an abuse of discretion by excluding this portion of Wendt's testimony and we affirm their decisions to exclude it.

Our decision to uphold the exclusion of the testimony based on false-confession literature is supported by *Vent v State*,[65] in which the Alaska Court of Appeals also upheld the exclusion of testimony by Leo that was very similar to the testimony he offered in the instant case. Like the circuit court here, the *Vent* court was "troubled by the fact that there was no way to quantify or test Dr. Leo's conclusions that certain techniques might lead to false confessions."[66] The *Vent* court explained that while some courts allow testimony of this sort, many have held that it is not an abuse of discretion to exclude it.[67] Ultimately, the *Vent* court concluded that there was "merit to [the Alaska

---

[64] The parties do not dispute that Wendt is qualified as an expert.

[65] *Vent v State*, 67 P3d 661, 667-670 (Alas App, 2003).

[66] *Id*. at 669.

[67] See, e.g., *Edmonds v State*, 955 So 2d 787 (Miss, 2007) (affirming the circuit court's decision excluding an expert's false confession testimony); *Green v State*, 55 SW3d 633, 640 (Tex App, 2001) (affirming the trial court's decision excluding an expert's false confession testimony); *United States v Griffin*, 50 MJ 278, 284 (CA AF, 1999) (holding that the testimony of a defense expert on false confessions was properly excluded as not sufficiently reliable); *Kolb v State*, 930 P2d 1238 (Wy, 1996) (affirming the exclusion of expert false confession testimony).

superior court's] questions concerning Dr. Leo's methodology . . . ."[68]  We have reached the same conclusion with regard to both experts' testimony relating to the literature of false confessions.[69]  However, this conclusion does not end our inquiry because Wendt's testimony also encompassed a second category: evidence of his psychological testing of defendant.

## 2. PSYCHOLOGICAL-TESTING EVIDENCE

Wendt also proposed to testify regarding defendant's psychological profile, which he constructed from psychological tests and clinical interviews of defendant.  The circuit court excluded the entirety of Wendt's testimony, reasoning that, without the evidence about false confession literature, his testimony on this subject would not assist the trier of fact.  This conclusion was based on the erroneous premise that this portion of Wendt's testimony was somehow dependent on false-confession research for its reliability.  The record establishes, however, that this portion of Wendt's testimony is, in fact, independent of the false-confession literature and was offered to illustrate a separate, but related, point regarding Wendt's specific study of defendant himself.[70]  Wendt testified at

---

[68] *Vent*, 67 P3d at 670.

[69] Our decision in this regard does not deprive defendant of his theory of the case: that he falsely confessed.  Defendant may cross-examine the police officers about their training regarding interrogation techniques and the methods they used in this case and may argue from this testimony that his confession was false.

[70] The Court of Appeals also excluded the entirety of Wendt's testimony because it would be unhelpful.  The Court's analysis is similarly faulty because, like the circuit court, the Court of Appeals failed to recognize that this part of Wendt's testimony is independent of the other testimony regarding false-confession literature.

length about the data he had gathered from an array of psychological tests he performed on defendant, his clinical interviews of defendant, and his review of the transcripts of defendant's interrogation. Wendt also explained the methods he applied to this data, how he compiled a psychological profile, and what opinions he formed from this analysis.

This is exactly the type of expert testimony regarding defendant's psychological profile that may "assist the trier of fact" within the meaning of MRE 702. Consequently, the circuit court abused its discretion by excluding this testimony on the basis of the absence of testimony about the false-confession literature. Because the circuit court did not apply the remaining MRE 702 factors to this second aspect of Wendt's testimony, we do not hold that the circuit court is required to admit Wendt's testimony, only that its basis for excluding Wendt's testimony amounted to an abuse of discretion. On remand, it remains the circuit court's duty to fulfill its gatekeeper role under MRE 702 with respect to any proposed expert testimony.[71]

Further, although the circuit court did not complete its analysis under MRE 702, it also opined that Wendt's testimony was properly excluded under MRE 403. We conclude that the circuit court's analysis of MRE 403 was similarly faulty. MRE 403 excludes relevant evidence only if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."[72] Evidence is unfairly prejudicial when "there exists a danger that *marginally* probative

---

[71] The dissent opines that Wendt's testimony regarding the psychological tests he performed is "irrelevant," *post* at 10, but as we have explained it is unnecessary to reach this issue because this determination is to be made by the circuit court on remand.

[72] MRE 403.

evidence will be given undue or preemptive weight by the jury."[73] In this case, the circuit court reasoned, "With no other evidence about false confessions, I don't see how this could be relevant, helpful or do anything other than be misleading," and concluded that its "probative value would be substantially outweighed by the danger of unfair prejudice." Thus, the circuit court ruled that Wendt's testimony had no probative value in the absence of the testimony about false-confession literature.[74] We have explained that testimony like that Wendt proposed to offer can provide guidance to a fact-finder regarding behavior that would seem counterintuitive to a juror. Accordingly, and if the proposed testimony otherwise meets the requirements of MRE 702, the circuit court must consider this benefit in assessing the probative value of the testimony. Because it failed to weigh Wendt's testimony on the probative side of the analysis, the circuit court abused its discretion by excluding the evidence under MRE 403.

---

[73] *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998) (emphasis added).

[74] The Court of Appeals' MRE 403 analysis also found that all the proffered expert testimony generally had little probative value and a danger of high prejudice because, in its view, the expert testimony "would interfere with the jury's role in determining the credibility and weight of the confession." *Kowalski*, unpub op at 5. This analysis does not take account of safeguards typically applied to expert testimony in similar contexts. In *Peterson* we observed that an expert may not "vouch for the credibility of a witness" and that a limiting instruction could ensure the jury used the testimony only for its proper purpose. *Peterson*, 450 Mich at 376. Similarly, in *Christel*, we observed that an expert is prohibited from "comment[ing] on the complainant's truthfulness." *Christel*, 449 Mich at 580. As we have explained, these same limitations apply to the expert testimony here, and a limiting instruction is available should the parties request it. Thus, the Court of Appeals' analysis is deficient because it failed to consider the safeguards that might negate the danger that the expert testimony will interfere with the jury's role.

Again, we do not hold that the circuit court is required to admit this portion of Wendt's testimony, just that it misapplied MRE 403 in excluding the testimony. However, in applying MRE 403 on remand, the circuit court must also consider whether the limits that this Court imposes on expert testimony of this nature and the possibility of a limiting jury instruction reduce the danger of any unfair prejudice.[75]

Accordingly, we reverse the portions of the Court of Appeals' judgment and the circuit court order excluding the expert testimony regarding Wendt's psychological testing of defendant. On remand, the circuit court must consider whether this testimony meets the requirements of MRE 702 and MRE 403.

## D. RIGHT TO PRESENT A DEFENSE

Finally, defendant claims that, to the extent *any* of the proposed expert testimony is excluded, the exclusion violates his right to present a defense. Criminal defendants have a constitutional right to "a meaningful opportunity to present a complete defense."[76] The Sixth Amendment of the United States Constitution provides that a criminal

---

[75] The dissent would exclude all of Wendt's testimony under MRE 403 as a matter of law, arguing that the testimony is not "even 'marginally probative evidence.'" *Post* at 12. It is unnecessary to consider under MRE 403 the portion of Wendt's testimony regarding false-confession literature, because it was properly excluded under MRE 702. Further, because the circuit court must consider the admissibility of the psychological testing evidence under MRE 702 on remand before reaching MRE 403, it is not necessary to conclude, as the dissent does, that this type of testimony is inadmissible under MRE 403 as a matter of law. Moreover, because Wendt's proposed expert testimony might have some probative value, the circuit court must undertake a new analysis of MRE 403 if it concludes on remand that the psychological testing evidence satisfies the requirements of MRE 702.

[76] *Crane*, 476 US at 690 (quotation marks and citation omitted).

defendant has the right "to have compulsory process for obtaining witnesses in his favor." This right has been incorporated to the states through the Fourteenth Amendment.[77] The Supreme Court of the United States has held: "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense . . . ."[78]

The right to present a defense limits the otherwise broad latitude of states to establish rules that exclude evidence from criminal trials.[79] When rules "infring[e] upon a weighty interest of the accused" and are "arbitrary" or "disproportionate to the purposes they are designed to serve," they must yield to the constitutional right.[80] However, while the right to present a defense is a fundamental part of due process, "it is not an absolute right," and "[t]he accused must still comply with 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'"[81]

We must therefore determine whether the exclusion of the expert testimony at issue denies defendant his constitutional right to present a defense. To do so, we consider the purpose MRE 702 is designed to serve. The purpose of nearly identical FRE 702 is to

---

[77] *Washington v Texas*, 388 US 14, 18; 87 S Ct 1920; 18 L Ed 2d 1019 (1967).

[78] *Id.* at 19.

[79] *United States v Scheffer*, 523 US 303, 308; 118 S Ct 1261; 140 L Ed 2d 413 (1998).

[80] *Id*. (quotation marks and citation omitted).

[81] *People v Hayes*, 421 Mich 271, 279; 364 NW2d 635 (1984), quoting *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973).

"ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[82]  In discussing FRE 702, the United States Supreme Court has explained that the inquiry is a "flexible one" and that "[i]ts overarching subject is the scientific validity" of the proposed testimony.[83]  The same can be said of MRE 702.[84]  Ultimately, courts are vested with the gatekeeping authority to apply MRE 702 on a case-by-case basis.[85]

The *lack* of such discretion is what has most often prompted the United States Supreme Court to strike down evidentiary rules as violative of the Sixth Amendment.  In *Rock v Arkansas*, for example, the Court considered a categorical rule prohibiting the consideration of a hypnotically refreshed memory.[86]  The Court struck down the rule because it "leaves a trial judge no discretion to admit this testimony, even if the judge is persuaded of its reliability by testimony at a pretrial hearing."[87]  In contrast, every proper application of MRE 702 requires a careful consideration of the reliability of the proffered evidence.  The very act of conducting a *Daubert* hearing establishes that a circuit court's gatekeeping role under MRE 702 is neither "arbitrary" nor "disproportionate to the ends [it is] asserted to promote" because "the Constitution permits judges to exclude evidence

---

[82] *Daubert*, 509 US at 589.

[83] *Id*. at 594-595.

[84] *Gilbert*, 470 Mich at 781 ("[T]he court's fundamental duty [is to] ensur[e] that *all* expert opinion testimony—regardless of whether the testimony is based on "novel" science—is reliable.").

[85] *Id.* at 779-783.

[86] *Rock v Arkansas*, 483 US 44; 107 S Ct 2704; 97 L Ed 2d 37 (1987).

[87] *Id*. at 56 n 12.

that is . . . only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues"[88] and evidence that fails to meet the requirements of MRE 702 will *always* be only marginally relevant or risk confusing the trier of fact.[89] Consequently, we hold the proper application of MRE 702 in this case to exclude Dr. Leo's testimony and the portion of Dr. Wendt's testimony that would rely on false confession research does not deny defendant his constitutional right to present a defense.

## IV. RESPONSE TO THE DISSENT

The dissenting justice's principal disagreement with our decision stems from our view that the phenomenon of false confessions is beyond the average person's common knowledge. The dissent, however, does not dispute that the "statement against interest" exception to the hearsay rule embodies the presumption that a person does not ordinarily make untruthful incriminating statements, which is a strong indicator that the circumstances of a false confession are beyond the average person's understanding. Still, the dissent dismisses the significance of the fact that this presumption is embodied in our

---

[88] *Holmes v South Carolina*, 547 US 319, 326-327; 126 S Ct 1727; 164 L Ed 2d 503 (2006) (quotation marks and citations omitted).

[89] Defendant's argument that *Crane v Kentucky*, 476 US 683, prohibits the circuit court from excluding the proffered evidence is without merit. In *Crane*, the United States Supreme Court held that a defendant had a right to argue to a jury that his confession was unreliable even after a judge had determined it to be voluntary. The Court held that excluding all testimony about the circumstances surrounding his confession was a constitutional violation of the defendant's right to present a defense because it excluded "competent, reliable evidence." *Id*. at 690. Yet *Crane* also acknowledged that states may "exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Id*.

rules of evidence as well as the significance of our caselaw recognizing that the aid of expertise can help jurors understand similarly counterintuitive behavior.[90] The dissent also does not dispute that our caselaw indeed permits expert testimony to explain counterintuitive behavior. Instead, the dissent insists that the average person is capable of understanding why a person might falsely confess to a crime and under what circumstances. This argument is unconvincing in part because it relies not on any established legal principles of our jurisprudence but, for the most part, on a law review article authored by a law student and on the concededly unreliable testimony of Leo.

Having posited that jurors can, in fact, understand without the aid of expertise why a person might falsely confess, the dissent supports this view with a list of our holding's supposed ill effects. But the dissent's fears that our decision will cause jurors to subordinate their judgment to the "false appearance of expertise,"[91] "open up the floodgates for expert testimony,"[92] and turn criminal trials into "battles of psychological experts"[93] are simply unfounded. Our holding is limited to the principle that a claim of a false confession is beyond the common knowledge of the ordinary person and that expert testimony regarding this phenomenon is admissible under MRE 702 only if it meets the

---

[90] Indeed, the dissent cites extensively the views of the dissenting justices in both *Peterson* and *Christel*. While those more narrow viewpoints are undoubtedly aligned with the dissenting justice's views in this case, those views failed to carry the day and are not the law of our state.

[91] *Post* at 3 (emphasis omitted).

[92] *Post* at 20.

[93] *Post* at 20.

other requirements of MRE 702. Thus, far from the dissent's interpretation of our decision, we have not created a rule allowing the admission of faux expert testimony regarding false confessions. Rather, a defendant proffering expert testimony on the phenomenon of false confessions must meet all the requirements not only of MRE 702, but also of MRE 403 before the testimony could be admitted. Thus, the ramifications the dissent fears—the "routine" use of experts by both the defense and the prosecution, and prolonged and more costly proceedings—are exaggerated. And while there may be some lengthening of the trial process in those few cases in which expert testimony regarding false confessions is admitted, the result is not "gamesmanship" "for no good reason," but an aid in the furtherance of a criminal trial's "principal mission, the search for the truth."[94]

Further, the dissent lists several types of behavior that it believes could be subject to expert testimony as a result of our decision. However, that concern is not supported by today's holding. We agree with the dissent that questions of eyewitness identification, fading memories, witnesses' body language, and the like involve obvious human behavior from which jurors can make "commonsense credibility determinations."[95] None of this behavior is recognized in our law as having special indicia of reliability. A statement against penal interest, on the other hand, is presupposed to be trustworthy and credible, which is precisely why an alleged false confession is a counterintuitive behavior that may, like other counterintuitive behavior recognized by our caselaw, require the aid

---

[94] *Post* at 3-4.

[95] *Post* at 21-22.

of expertise to explain. The legal principles that *are* the foundation of our holding do not also support the need for expert testimony to explain the common human behavior described by the dissent.

## V. CONCLUSION

We affirm the exclusion of Leo's testimony and the portion of Wendt's testimony based on false-confession research because the circuit court's determination that it was not reliable under MRE 702 was not an abuse of discretion and its exclusion does not violate defendant's right to present a defense. Because the circuit court and the Court of Appeals erred by excluding Wendt's testimony regarding the psychological testing he performed on the ground that it depended on the testimony of Leo, we reverse those rulings and remand this case to the circuit court for the court to determine its admissibility under MRE 702 and MRE 403.

Mary Beth Kelly
Robert P. Young, Jr.
Brian K. Zahra

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                No. 141932

JEROME WALTER KOWALSKI,

      Defendant-Appellant.

_____

CAVANAGH, J. (*concurring*).

I concur in the result reached by the lead opinion.

I agree with the lead opinion that the phenomenon of false confessions is counterintuitive and, thus, inconsistent with "'the common-sense intuition that a reasonable person would be expected to lie, if at all, only in his own favor, and would not harm himself by his own words.'" *Ante* at 20-21, quoting *People v Watkins*, 438 Mich 627, 636; 475 NW2d 727 (1991), see, also, *United States v Shay*, 57 F3d 126, 133 (CA 1, 1995) ("Common understanding conforms to the notion that a person ordinarily does not make untruthful inculpatory statements."); *Crane v Kentucky*, 476 US 683, 689; 106 S Ct 2142; 90 L Ed 2d 636 (1986) (noting the "one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?"). Accordingly, I agree with the lead opinion that expert testimony may assist jurors in understanding the existence of false confessions, including how and why a defendant might falsely confess. *Craig v Oakwood Hosp*, 471 Mich 67, 79; 684 NW2d 296 (2004).

Thus, I agree that the lower courts erred in excluding the expert testimony to the extent that they concluded otherwise.

I believe that appellate review of whether a trial court's decision to exclude evidence resulted in an abuse of discretion requires an examination of the importance of the testimony to a defendant's theory of defense. See *People v Barrera*, 451 Mich 261, 269; 547 NW2d 280 (1996). At this juncture and under this Court's current evidentiary rule, however, I find that the issue presented in this case raises a close evidentiary question regarding Dr. Richard Leo's proposed testimony. Thus, I agree with the lead opinion's conclusion that the trial court did not abuse its discretion by excluding as unreliable Leo's testimony as it pertains to police-interrogation techniques. *People v Golochowicz*, 413 Mich 298, 322; 319 NW2d 518 (1982).

And although I find persuasive the principles espoused by the Court of Appeals partial dissent as it relates to Dr. Jeffrey Wendt, *People v Kowalski*, unpublished opinion per curiam of the Court of Appeals, issued August 26, 2010 (Docket No. 294054) (DAVIS, J., concurring in part and dissenting in part), I agree with this Court's conclusion that it is prudent to remand this case to the trial court to consider the admissibility of Wendt's testimony in the first instance, in light of the trial court's failure to consider Wendt's testimony independently of Leo's testimony. Nevertheless, on remand, I urge the trial court to "conscientiously consider" the relationship between the evidentiary rules and defendant's constitutional right to present a defense. *Barrera*, 451 Mich at 269.

2

When the accuracy of a potential conviction rests in large part on the accuracy of a confession, I believe that a trial court should give due consideration to the importance of a defense theory that seeks to undermine the accuracy of the confession.

Michael F. Cavanagh
Marilyn Kelly
Diane M. Hathaway

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                         No. 141932

JEROME WALTER KOWALSKI,

      Defendant-Appellant.

_____

MARKMAN, J. (*concurring in part and dissenting in part*).

    I agree with the lead opinion that (a) the trial court did not abuse its discretion by ruling that Dr. Richard Leo's proffered expert testimony regarding the existence of false confessions and the interrogation techniques claimed to generate them is unreliable and thus inadmissible under MRE 702, (b) for the same reason, to the extent that Dr. Jeffrey Wendt's proffered testimony relied on Leo's false confession testimony, the trial court did not abuse its discretion by excluding this testimony, and (c) the exclusion of this testimony did not violate defendant's Sixth Amendment right to present a defense. However, I respectfully disagree with the lead opinion's conclusions that (a) expert testimony regarding the existence of false confessions, even if reliable, is admissible under MRE 702 because it is beyond the common knowledge of the average juror and (b) Wendt's testimony concerning defendant's psychological characteristics, even if reliable, is relevant and thus admissible under MRE 702. Instead, I conclude that (a) expert testimony regarding the existence of false confessions is not beyond the common knowledge of the average juror and thus is inadmissible under MRE 702 and (b) Wendt's

testimony concerning defendant's psychological characteristics is irrelevant because, as Wendt himself admits, none of these characteristics make it "more probable or less probable," MRE 401, that defendant's confession was either true or false, and thus his testimony is also inadmissible under MRE 702. In other words, I conclude that the trial court did not abuse its discretion by excluding Leo's and Wendt's proffered testimony. Accordingly, I would affirm the judgment of the Court of Appeals.

## I. SUMMATION

The issue in this case is not whether defendants may sometimes falsely confess. Indeed, it is precisely because this possibility is so obvious that it can hardly be said to be "beyond the common knowledge of the average juror" and thus an appropriate subject of "expert" testimony under the law. Moreover, there is nothing offered in this case by the asserted "experts" on false confessions that would afford jurors any actual assistance in determining whether *defendant's* confession was, in fact, false. The police interrogation techniques Leo identified as being associated with *false confessions* were acknowledged by Leo as also being associated with *true confessions,* and the psychological traits Wendt identified as evidence of a possible *false confessor* were acknowledged by Wendt as also being traits that might be possessed by *nonfalse* confessors. Thus, neither expert's proposed testimony is relevant in any way to the jury in deciding whether *defendant* was a false confessor or a nonfalse confessor. It is hard to think of a function more central to the traditional jury role than to ascertain the credibility of ordinary witnesses and other persons. To introduce into the jury process "expert" witnesses who will testify that persons will sometimes falsely confess is to belabor the obvious and create the illusion that there is some "scientific, technical, or other specialized knowledge" that will assist

2

the jury in carrying out its core responsibility of determining credibility. Thus, the introduction of "experts" into the realm of the mundane does not merely risk *distracting* the jury, but risks the prospect of jurors increasingly *subordinating* their own commonsense judgments-- precisely the kind of judgments that form the rationale for the jury system in the first place-- to the false *appearance* of expertise suggested by the presence of expert psychological testimony. The criminal trial of the near future in Michigan, one being nudged forward by today's decision, is one in which: (a) increasing numbers of criminal defendants will as a matter of routine employ "expert" witnesses to attempt to dispel the trustworthiness of their confessions, (b) increasing numbers of criminal defendants will be encouraged not to testify on their own behalf that they falsely confessed, preferring to let the jury infer this same conclusion from the testimony of "experts," (c) prosecutors will be increasingly incentivized to respond to testimony by defendants' "experts" that *false* confessions sometimes occur with testimony by their own "experts" that *truthful* confessions sometimes also occur and that, in fact, truthful confessions tend to occur more often than false confessions, with defendants' "experts" then responding that, while that may all be true, false confessions nonetheless occur more often than acknowledged by the prosecutors' "experts," (d) ordinary issues of credibility traditionally resolved by juries through the exercise of their own common sense, judgment, and experience will increasingly become the subject of battling contingents of "experts," and (e) increasingly frequent and distracting courtroom debates will take place concerning other unremarkable propositions of human behavior such as that memories fade over time, police officers sometimes testify falsely, and persons who do not look others in the eye may sometimes be testifying dishonestly. As a result, and for no good

3

reason, the criminal trial of the near future will be slightly more prolonged, slightly more costly for all parties, and ever slightly more open to the kind of gamesmanship that distracts the criminal trial from its principal mission, the search for the truth.

## II. STANDARD OF REVIEW

This Court reviews a trial court's decision to exclude expert testimony for an abuse of discretion. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). A trial court abuses its discretion when it "chooses an outcome falling outside [the] principled range of outcomes." *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

## III. ANALYSIS

MRE 702 governs the admissibility of expert witness testimony and provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 702 requires expert testimony to be both reliable and relevant. See *Daubert v Merrell Dow Pharm, Inc*, 509 US 579, 597; 113 S Ct 2786; 125 L Ed 2d 469 (1993) ("[T]he Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."); *Kumho Tire Co, Ltd v Carmichael*, 526 US 137, 141; 119 S Ct 1167; 143 L Ed 2d 238 (1999) ("[S]cientific expert testimony . . . is admissible only if it is both relevant and reliable."); *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780 n 46; 685 NW2d 391 (2004), quoting *Daubert*, 509 US at 589 ("'[T]he trial judge must ensure that

4

any and all scientific testimony or evidence admitted is not only relevant, but reliable.'") (emphasis omitted).

## A. TESTIMONY OF DR. LEO

I do not believe that the trial court abused its discretion by excluding Leo's testimony pursuant to MRE 702. For the reasons explained by the lead opinion, I agree that Leo's proposed testimony was not the product of reliable principles and methods and thus is inadmissible on this basis alone. However, I disagree with the lead opinion's conclusion that had Leo's testimony been the product of reliable principles and methods, it *would* have been admissible. I do not believe that the trial court abused its discretion by concluding that Leo's proposed testimony would not "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." MRE 702. "'Expert testimony is not admissible . . . when it merely deals with a proposition that is not beyond the ken of common knowledge.'" *Gilbert*, 470 Mich at 790 (citation and emphasis omitted).

Leo proposed to testify that people sometimes falsely confess. However, this is not a proposition that is outside the "common knowledge" of the average juror. Jurors, as ordinary members of the community with ordinary measures of judgment, common sense, experience, and personal insight, understand that people sometimes falsely confess, although jurors also understand that false confessions are far from the norm. Defendant argues that jurors have a tendency to believe that people will not confess to a crime that they did not commit. Quite likely, defendant is correct. However, this asserted tendency is not inconsistent with Leo's *own* testimony at the *Daubert* hearing. Leo testified that most jurors assume that if the defendant confessed he is "probably

5

guilty," but Leo also acknowledged that "most confessions are true" and that "false confessions are the exception." Therefore, as long as the prosecutor does not argue that people *never* falsely confess, which he has not argued here, Leo's proposed testimony that false confessions are possible offers absolutely nothing of relevance to the jury.

"[T]here is no need for expert testimony that tells the jury what it already knows." Comment, *The (In)admissibility of False Confession Expert Testimony*, 26 Touro L R 23, 58 (2010). "As it stands, most jurors have a nuanced understanding that false confessions occur, but only rarely. An expert witness that simply repeats this fact is not 'assisting the trier of fact.'" *Id.* at 59. As one commentator explained:

> False confession theorists . . . [argue that] false confession expert testimony helps combat against . . . the myth that false confessions do not occur. However, the numbers simply do not support the notion that this myth exists. For instance, one statistic used to demonstrate this myth is that sixty eight percent of potential jurors in the District of Columbia believe that suspects falsely confess "not very often" or "almost never." Implying that these answers foreclose even the possibility of false confessions within the minds of jurors is simply wordplay: "not very often" and "almost never" do not mean "never." In fact, the data clearly corroborates most jurors' beliefs that concede the possibility of a false confession in a given case, while also noting its statistical improbability. The notion that some suspects might confess to something they did not do is within the common knowledge of jurors. [*Id.* at 56-57, citing in part Leo, *Police Interrogation and American Justice*, p 196 (2008).]

Because Leo's proposed testimony concerning the existence of false confessions is "'not beyond the ken of common knowledge,'" *Gilbert*, 470 Mich at 790 (citation omitted), it is unlikely to "assist the trier of fact to understand the evidence or to determine a fact in issue," MRE 702, and thus is inadmissible under MRE 702.[1]

---

[1] The lead opinion contends that its conclusion that the fact that someone might falsely confess is "contrary to common sense" is supported by "[o]ur 'statement against interest'

6

Leo also proposed to testify that certain interrogation techniques are associated with false confessions.  However, given that he admitted that these *same* interrogation techniques are also associated with true confessions, I fail to see how this testimony could assist the jury.[2]  Informing the jury that certain interrogation techniques result in

exception to the hearsay rule [which] embodies [the] presumption . . . 'that a reasonable person . . . would not have made [such a] statement unless believing it to be true.'"  *Ante* at 20, quoting MRE 804(b)(3).  However, what the lead opinion wholly fails to recognize is that Leo does not dispute that people generally do not falsely confess.  Leo knows this, and jurors know this.  Leo and jurors also know that there are exceptions to this general presumption and that people sometimes do falsely confess.  There is absolutely nothing inconsistent between the notions that people generally do not falsely confess and that people sometimes do falsely confess and I do not believe that either of these notions lies outside the common knowledge of jurors.  See *State v Free*, 351 NJ Super 203, 220; 798 A2d 83 (2002) (citation omitted) ("Although our rules of evidence recognize that people do not usually make statements against their penal interest unless they are true, it does not follow that ordinary jurors believe that all confessions made by defendants subjected to police interrogation are true."); see also Comment, 26 Touro L R at 53 ("That false confessions occur is a matter of fact; however, it is also true that false confessions are rare.").

[2] For example, Leo testified:

> [P]olice using coercive techniques sometimes results in true confessions, sometimes results in false confessions.

> \* \* \*

> The coercive, problematic techniques that might, when applied to an innocent person, lead to a false confession, but when applied to a guilty person, lead to a true or a partially true confession.  You can't infer from the techniques used whether you'll get a true or false confession.

> \* \* \*

> [T]he interrogation process . . . can lead to both true and false confessions.

either true or false confessions does nothing to advance the jury's thinking. The jurors obviously know that the confession before them is either true or false, and it is their job to determine whether it is true or false. Instructing them that a confession is either true or false is only belaboring the obvious. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 US at 591-592. Because Leo admitted that there is no "scientific connection" between any of the interrogation techniques that he proposes to testify about and the truthfulness of a confession, his proposed testimony about these interrogation techniques does not satisfy the "helpfulness" standard of Rule 702.[3]

---

[3] As the Ohio Court of Appeals explained:

> Dr. Leo . . . explained that coercive interrogation techniques do tend to be effective in producing their desired result: a confession. He conceded on cross-examination, however, that coercive techniques are also effective in inducing true confessions and he could not offer any opinion as to how many of the resulting confessions are truthful and how many are false. Thus, he could offer no expert insight into the actual likelihood that coercive interrogation tactics will lead to a false confession.

> \* \* \*

> As explained above, Dr. Leo conceded that he could not predict when a confession was false, nor could he opine that coercive interrogation tactics are more likely to yield false confessions instead of truthful ones. Dr. Leo could not offer an opinion on which interrogation techniques lead to false confessions, he had no information about the percentage of confessions that are truthful or false, nor could he analyze a given confession and offer an opinion as to whether it was true or false.

> \* \* \*

> It was not beyond the knowledge of lay jurors that coercive police interrogation tactics might be more likely to induce a confession from a

8

As the Court of Appeals explained:

> We conclude that the trial court did not abuse its discretion by excluding Dr. Leo's testimony. The trial court concluded that Dr. Leo was qualified in terms of knowledge, but it excluded Dr. Leo's testimony on several grounds including its finding that the testimony would not assist the trier of fact in understanding the evidence or in determining a fact at issue. MRE 702. This was not an abuse of discretion. Defendant essentially offered Dr. Leo's testimony to help the jury determine the reliability of defendant's confession. However, Dr. Leo's testimony would not have involved a proposition that was outside the common knowledge of a layperson. *Gilbert*, 470 Mich at 790. Dr. Leo acknowledged that the same interrogation techniques that he determined led to false confessions could also lead to true confessions. He could not identify any unique correlation between certain police interrogation tactics and false confessions. Dr. Leo explained that the reliability of a confession is determined by considering whether aspects of the confession fit with the evidence in the case. Nothing in the record here indicates that a juror cannot perform this same analysis without the assistance of expert testimony. Further, the police interrogation of defendant was recorded and the jury will be able to review the recordings at trial. Additionally, the police officers will be subject to cross-examination with respect to their specialized training in the art of interrogation and techniques they may use to pressure a defendant into confessing to a crime. The jury will be able to consider the manner in which defendant's confession was elicited, and the way in which his statements progressed during the course of the interrogation, and it will be able to weigh the interrogation and confession with the remainder of the evidence introduced at trial and make a determination as to the credibility of the confession. No expert testimony is needed to assist the jury in this process. See *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992) (issues involving credibility are within the sole province of the jury). [*People v Kowalski*, unpublished opinion per curiam of the Court of Appeals, issued August 26, 2010 (Docket No. 294054), pp 3-4.]

---

criminal suspect, nor was the fact that suspects do sometimes falsely confess to a crime. [*State v Wooden*, unpublished opinion of the Ohio Court of Appeals, issued July 23, 2008 (Docket No. 23992), pp 7-9; 2008-Ohio-3629, ¶¶ 22, 26, 28.]

As even the concurring/dissenting Court of Appeals judge explained, Leo's "conclusion that certain police interrogation techniques are associated with false confessions . . . is useless" because "[t]he police interrogation techniques Dr. Leo associated with false confessions are also associated with true ones and partially true ones, and there is no known difference in rates." *Id.* at 2 (DAVIS, J., concurring in part and dissenting in part). "[A]ll Dr. Leo can tell us is that police interrogation techniques are associated with *confessions*," and "[t]his association will not assist the jury[.]" *Id.* (emphasis in the original).[4]

Because Leo admitted that the same interrogation techniques that result in false confessions may also result in true confessions, his proposed testimony concerning interrogation techniques will not "assist the trier of fact to understand the evidence or to determine a fact in issue," and thus it is inadmissible under MRE 702.

## B. TESTIMONY OF DR. WENDT

Wendt proposed to testify that defendant possesses some psychological traits that can lead to false confessions. However, given that he admitted that these same psychological traits can also lead to true confessions, this testimony is equally irrelevant.[5] Informing the jury, for example, that defendant is an "anxious" person, and that anxious

_____

[4] Similarly, the trial court explained:

> If . . . the same techniques can lead to a true or false confession, I don't understand what relevance it would have, what relevance there would be to having Dr. Leo testify about police techniques. I don't see how he can assist the jury, how he can be helpful to the jury.

[5] For example, when asked whether "people who have the psychological factors that you've talked about can just as equally truly confess," Wendt answered, "Correct."

people sometimes falsely confess, and also sometimes truthfully confess, does little to advance the jury's thinking. The jury's responsibility is to determine whether a confession is true or false, and unless an expert has something to offer the jury in this regard that will make it more or less likely that the confession is either true or false, the expert's testimony is irrelevant. See MRE 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

As the Court of Appeals correctly explained:

> Dr. Wendt admitted that the same personality traits that correlate with false confessions can also lead to true confessions. Dr. Wendt could not identify a specific psychological factor that distinguishes a person who makes a false confession from one who makes a true confession. Thus, his testimony would have been of no help to the jury because the jury would have still been required to weigh defendant's confession against the other evidence in the case to determine whether it was credible. [*Kowalski*, unpub op at 5.][6]

---

[6] See also *Bixler v State*, 582 NW2d 252, 256 (Minn, 1998) ("Clearly the trial court was well within its discretion in ruling that the jury, without the testimony of the psychological expert, was fully capable of observing and understanding [the defendant's] propensity to please authority figures, and taking those observations and that understanding into account in evaluating his confession."); *People v Wood*, 341 Ill App 3d 599, 608; 793 NE2d 91 (2003) ("Dr. Greenberg's testimony was properly barred" because "Dr. Greenberg's testimony that defendant was easily coerced and susceptible to intimidation is not beyond the understanding of ordinary citizens, nor is the concept difficult to understand."). Furthermore, in the instant case, Wendt's proposed testimony that defendant may have been vulnerable to interrogation techniques is particularly irrelevant in light of the interrogating officer's testimony that he was actually "try[ing] to talk [defendant] out of the confession" because defendant "had already told [the officer he] had done something and [the officer] didn't believe the details."

11

## C. MRE 403

Even assuming for the sake of argument that Leo's and Wendt's testimony is relevant and reliable, I believe that its "probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403. "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998). As the United States Supreme Court has explained:

> "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." [*Daubert*, 509 US at 595, quoting Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 FRD 631, 632 (1991).]

For the reasons explained earlier, I do not believe that the testimony at issue here is even "marginally probative evidence," but even if it were, there would be a considerable risk that the jury would accord undue weight to the experts' testimony. "Since experts base their testimony on science, jurors tend to find the testimony more convincing, and therefore the risk of misleading and confusing them increases." Comment, 26 Touro L R at 37. "'[Q]uestions of credibility, whether of a witness or of a confession, are for the jury,'" *Crane v Kentucky*, 476 US 683, 688; 106 S Ct 2142; 90 L Ed 2d 636 (1986) (citation omitted), but the admission of expert testimony on the subject of false confessions, or on other subjects that are within the "common knowledge" of jurors and that pertain to credibility, have the potential to undermine the jury's role in this regard. "Indeed, as we have cautioned before, the jury in these credibility contests is looking 'to

hang its hat' on the testimony of witnesses it views as impartial," *People v Peterson*, 450 Mich 349, 376; 537 NW2d 857 (1995), and it may easily come to perceive the testimony of the expert as supplying a shortcut for resolving credibility disputes between witnesses.

In the instant case, defendant will be arguing that the confession is false,[7] the prosecutor will be arguing that the confession is true, and the experts' testimony concerning false confessions, if admitted, would be viewed by the jury as testimony from people who study false confessions for a living, in support of defendant's position that the confession is false. Even though the experts will not be allowed to expressly testify that they believe that defendant falsely confessed, the jury will be led to believe that the experts know more than they are telling, because the jury will almost certainly infer that the experts must believe that defendant's confession is false or else they would not be testifying on his behalf. See *Peterson*, 450 Mich at 391 (CAVANAGH, J., dissenting). The danger that the jury will be misled by the experts' testimony to believe that the interrogation techniques used by the police, in conjunction with defendant's personality traits, must have resulted in a false confession is substantial, and thus the risk that the jury's role in making credibility determinations will be undermined is also substantial.[8]

---

[7] Defense counsel argues that if he were not allowed to present the expert witness testimony to the jury, he would be left with no response whatsoever to defendant's confession. This is simply untrue. In fact, defense counsel would be left with what is, in my opinion, the best response to the confession: defendant's own explanation regarding why he confessed.

[8] For a discussion of the potential of expert psychological testimony to mislead jurors, see *Clark v Arizona*, 548 US 735, 774-778; 126 S Ct 2709; 165 L Ed 2d 842 (2006) ("[T]hese empirical and conceptual problems add up to a real risk that an expert's judgment in giving . . . evidence will come with an apparent authority that psychologists and psychiatrists do not claim to have.").

As a plurality of the United States Supreme Court explained in *United States v Scheffer*, 523 US 303, 313-314; 118 S Ct 1261; 140 L Ed 2d 413 (1998), regarding polygraph evidence:

> A fundamental premise of our criminal trial system is that "the *jury* is the lie detector." Determining the weight and credibility of witness testimony, therefore, has long been held to be the "part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men."
>
> By its very nature, polygraph evidence may diminish the jury's role in making credibility determinations. The common form of polygraph test measures a variety of physiological responses to a set of questions asked by the examiner, who then interprets these physiological correlates of anxiety and offers an opinion to the jury about whether the witness—often, as in this case, the accused—was deceptive in answering questions about the very matters at issue in the trial. Unlike other expert witnesses who testify about factual matters outside the jurors' knowledge, such as the analysis of fingerprints, ballistics, or DNA found at a crime scene, a polygraph expert can supply the jury only with another opinion, in addition to its own, about whether the witness was telling the truth. Jurisdictions, in promulgating rules of evidence, may legitimately be concerned about the risk that juries will give excessive weight to the opinions of a polygrapher, clothed as they are in scientific expertise and at times offering, as in respondent's case, a conclusion about the ultimate issue in the trial. Such jurisdictions may legitimately determine that the aura of infallibility attending polygraph evidence can lead jurors to abandon their duty to assess credibility and guilt. [Citations omitted; emphasis in the original.]

Similarly, expert testimony concerning false confessions may diminish the jury's role in making credibility determinations. Jurors may give excessive weight to this testimony and abandon or subordinate their own primary duties to assess credibility and guilt. "[T]he testimony would . . . convert the expert witness into a human lie detector," and "[c]ourts should be as wary of admitting human lie detectors as they are of admitting the results of a polygraph test." Comment, 26 Touro L R at 57-58. "Our criminal justice

14

system is founded on the belief that juries can understand when statements might be unreliable, and admitting expert testimony on false confessions upends this fundamental pillar." *Id.* at 74. For these reasons, I do not believe that the trial court abused its discretion by concluding that the probative value of the experts' testimony is substantially outweighed by the danger of unfair prejudice.[9]

As the Court of Appeals explained:

> Although both experts testified that they would not offer opinion regarding whether defendant made a false confession, that conclusion was implicit in both of their proposed testimonies. This would interfere with the jury's role in determining the credibility and weight of the confession. Thus, there was a significant danger of unfair prejudice with respect to the proposed testimony; and, as discussed above, neither of the expert's proposed testimony had high probative value. The trial court did not abuse its discretion by concluding that MRE 403 was an additional basis on which to exclude the proffered expert testimony. [*Kowalski*, unpub op at 5.][10]

---

[9] I disagree with the lead opinion's conclusion that its "safeguards," such as the availability of a limiting instruction, "negate the danger that the expert testimony will interfere with the jury's role." *Ante* at 30 n 74. If that were the case, a limiting instruction would be able to cure all concerns relating to the probative value of evidence being "substantially outweighed by the danger of unfair prejudice," and MRE 403 would be rendered meaningless. That is, if it were sufficient to simply instruct the jury not to allow evidence's "probative value [to be] substantially outweighed by the danger of unfair prejudice," there would be no point in having a court rule that specifically provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403. The lead opinion's other "safeguard" of not allowing the expert to expressly state that the defendant falsely confessed also does little to alleviate concerns about misleading the jury. When a jury is confronted with expert testimony that certain interrogation techniques may result in false confessions paired with testimony that the defendant himself was subject to these interrogation techniques, the invited inference will be just as misleading as expert testimony stating outright the conclusion that the defendant falsely confessed. See *Peterson*, 450 Mich at 392 (CAVANAGH, J., dissenting).

[10] Appellate courts in other jurisdictions have likewise concluded that a trial court does not abuse its discretion when it excludes expert testimony on false confessions. See, for

15

## D.  LEAD OPINION CASELAW

The lead opinion relies on *Peterson*, 450 Mich at 352-353, which held that

> (1) an expert may testify in the prosecution's case in chief regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim, and (2) an expert may testify with regard to the consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim's credibility.

Justice CAVANAGH, joined by Justice LEVIN, dissented and explained that he would have "continue[d] to limit the use of behavioral reaction testimony to rebuttal purposes" and "preclude[d] an expert . . . from making any reference to the particular complainant or

---

example, *Wooden*, unpub op at 10; 2008-Ohio-3629 at ¶ 29 (holding that the trial court did not abuse its discretion by excluding Dr. Leo's testimony because it "would not offer the jurors any insight outside their own knowledge and experience"); *Vent v State*, 67 P3d 661, 669 (Alas App, 2003) (holding that the trial court did not abuse its discretion by concluding that "Dr. Leo's testimony would not appreciably aid the jury in determining whether [the defendant] made a false confession"); *State v Cobb*, 30 Kan App 2d 544, 567; 43 P3d 855 (2002) (holding that "[t]he type of testimony given by [Dr.] Leo in this case invades the province of the jury and should not be admitted"); *Free*, 351 NJ Super at 221 (holding that the trial court abused its discretion by admitting expert testimony that amounted to "'nothing more than an assertion that false confessions do occur'" because such testimony "would be of no assistance to the jury") (citation omitted); *United States v Adams*, 271 F3d 1236, 1246 (CA 10, 2001) (holding that "[t]he judge was well within his discretion in determining that the evidence lacked relevance and would not 'assist the trier of fact as required by Rule 702'") (citation omitted); *State v Davis*, 32 SW3d 603, 609 (Mo App, 2000) (holding that the trial court did not abuse its discretion by excluding Dr. Leo's testimony because "the jury would not be aided by Dr. Leo's testimony"); *State v Ritt*, 599 NW2d 802, 811-812 (Minn, 1999) (holding that "the trial court was within its discretion in excluding the expert testimony" because "the credibility of witnesses in criminal trials [should not] turn on the outcome of a battle among experts"); *State v Tellier*, 526 A2d 941, 943-944 (Me, 1987) (holding that the trial court did not abuse its discretion by excluding testimony "that false confessions do occur" because "its probative value was substantially outweighed by the danger of confusing the issues and of misleading the jury").

16

defendant" because "[t]he marginal probative value of allowing the expert to further testify with respect to the particular complainant is substantially outweighed by the danger of unfair prejudice that the jury will misuse the testimony." *Id.* at 381-382, 391.[11]

The lead opinion also relies on *People v Christel*, 449 Mich 578, 580, 592; 537 NW2d 194 (1995), which held that "battered woman syndrome testimony is relevant and helpful [and thus admissible] when needed to explain a complainant's actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting allegations of abuse" because "expert testimony is needed when a witness' actions or responses are incomprehensible to average people." Justice CAVANAGH, again joined by Justice LEVIN, concurred in part and dissented in part. He would have "limit[ed] the use of the battered woman syndrome evidence to the narrow purpose of rebutting an inference that the complainant's postincident behavior is inconsistent with that expected of rape victims" and would not have "allow[ed] an expert witness to testify with respect to the complainant's behavior in the particular case" because "the marginal probative value of allowing testimony with respect to the specific complainant's behavior is substantially outweighed by the unfairly

---

[11] The dissent further explained that such expert testimony

> invades the province of the jury to assess credibility. It invites the jury to give undue weight to testimony that is foundationally and fundamentally unreliable merely because it is cloaked with the expertise of an expert. It also invites the jury to believe that the expert knows more than he is telling, by letting the jurors infer that the expert, who works with sexually abused children every day, must believe this child's story or else the expert would not be testifying. [*Peterson*, 450 Mich at 391 (CAVANAGH, J., dissenting).]

17

prejudicial danger that the jury may conclude that the expert, in fact, knows that the complainant has been a battered individual." *Id*. at 601-602.

I agree with the lower courts that *Peterson* and *Christel* are fully distinguishable. First, they were decided before this Court amended MRE 702 to conform to *Daubert*, so the trial court's gatekeeper role was different than it is now. Under the pre-*Daubert* version of MRE 702, the trial court's sole function was to determine whether the expert's testimony was "generally accepted within the scientific community." *Craig v Oakwood Hosp*, 471 Mich 67, 80; 684 NW2d 296 (2004). The trial court's gatekeeping function is much broader under the current version of MRE 702. "Rule 702 . . . assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 US at 597; see also *Kumho*, 526 US at 152 ("The objective of [*Daubert*'s gatekeeping requirement] is to ensure the reliability and relevancy of expert testimony."); *Allison v McGhan Med Corp*, 184 F3d 1300, 1310 (CA 11, 1999) ("[W]hile Rules 401 and 402 reflect the general policy of the Federal Rules for liberal admission of evidence, Rule 403, working in conjunction with Rules 702 and 703, militates against this general policy by giving courts discretion to preclude expert testimony unless it passes more stringent standards of reliability and relevance. These stricter standards are necessary because of the potential impact on the jury of expert testimony."). Furthermore, although it is common knowledge that sometimes people falsely confess, knowledge of how a sexually abused child or a battered woman may react to the abuse may not be so common. While it is one thing for this Court to hold that psychological expert testimony may be necessary in extraordinary and narrow circumstances involving a sexually abused child or a battered woman-- in which it is the

18

remarkable sense of dependency of the victims on those who have abused them that may

explain their conduct-- it is quite another to extend this proposition, as the lead opinion

does, to commonplace circumstances in which a competent person has confessed to

committing a crime. An ordinary juror may well lack the life's experience to

comprehend what is entailed in the extraordinary relationships of the sexually abused

child and the battered woman, but deciding ordinary questions of witness credibility lies

at the heart of the juror's responsibility.[12]

The lead opinion also relies heavily on *People v Hamilton*, 163 Mich App 661;

415 NW2d 653 (1987), which held that the trial court abused its discretion by excluding

expert testimony concerning the defendant's psychological makeup because the jury

---

[12] The lead opinion contends that I "unreasonably assume[] that the ordinary juror has the 'life's experience to comprehend' the circumstances of police interrogation . . . and the effect of a defendant's particular psychological traits on the outcome of the interrogation." *Ante* at 19 n 48 (citation omitted). However, the lead opinion fails to explain how Leo's proposed testimony that the same police interrogation techniques that cause false confessions also cause true confessions or Wendt's proposed testimony that the same psychological traits that cause false confessions also cause true confessions will in any way help the jury decide whether the "circumstances of police interrogation" or defendant's "particular psychological traits" caused him to truthfully or falsely confess. Furthermore, as the Court of Appeals explained:

> [T]he police interrogation of defendant was recorded and the jury will be able to review the recordings at trial. Additionally, the police officers will be subject to cross-examination with respect to their specialized training in the art of interrogation and techniques they may use to pressure a defendant into confessing to a crime. The jury will be able to consider the manner in which defendant's confession was elicited, and the way in which his statements progressed during the course of the interrogation, and it will be able to weigh the interrogation and confession with the remainder of the evidence introduced at trial and make a determination as to the credibility of the confession. [*Kowalski*, unpub op at 4.]

19

should have been able to use this evidence to assess the defendant's credibility. First, this case too was decided before MRE 702 was amended to adopt *Daubert*'s standards. Second, *Hamilton* did not address at all whether the probative value of the proposed testimony was substantially outweighed by the danger of unfair prejudice under MRE 403. Furthermore, the defendant in *Hamilton* was a 16-year-old child when he committed the offenses and, although he was 22 years old when he confessed, he was operating psychologically at the level of a 15-year-old. *Hamilton* is distinguishable from the instant case because *Hamilton* involved a child with a disability, while the instant case involves an adult with no disability. Therefore, it is not necessary for this Court in this case to determine whether *Hamilton* was correctly decided.

## E. PRINCIPAL CONCERN

My principal concern with the lead opinion pertains to its holding that expert testimony concerning false confessions, if reliable, is admissible because it is beyond the "common knowledge" of the average juror. I disagree with this assertion and am concerned that such a holding has the potential to open up the floodgates for expert testimony on a host of reasonably obvious matters of human behavior that have never been generally thought to require expert testimony. As a result, criminal trials will be increasingly converted into battles of psychological experts. See *State v Sabetta*, 680 A2d 927, 933 (RI, 1996) ("[T]o introduce the expert testimony of a psychologist concerning the unreliability of eyewitness memory . . . would effectively invade the province of the jury and . . . open a floodgate whereby experts would testify on every conceivable aspect of a witness's credibility.").

20

What other reasonably obvious matters of human behavior are beyond the "common knowledge" of the average juror, and may therefore necessitate expert testimony? Is it within the "common knowledge" of the juror that it is possible for a witness to inadvertently testify inaccurately or for a witness to deliberately testify falsely? Is it within the "common knowledge" of the juror that some parts of a witness's testimony may be true, while others may be false? Is it within the "common knowledge" of the juror that eyewitness recollections may differ, although each eyewitness is testifying honestly? Is it within the "common knowledge" of the juror that sometimes police officers testify falsely and sometimes convicted felons testify truthfully? Is it within the "common knowledge" of the juror that it is possible for an eyewitness to misidentify a person? Is it within the "common knowledge" of the juror that memories fade over time? Is it within the "common knowledge" of the juror that particular forms of body language may sometimes evidence honesty or dishonesty? Should we or should we not require expert testimony regarding each of these matters? If not, why not and, if so, what exactly should be left for the jury to decide on its own?

Until today, "such normal human processes were held to be within the knowledge and experience of the jury, the triers of fact, thus requiring no expert opinion to clarify or inform their rational decision-making roles." Clifford, *Expert Testimony*, in Towl & Crighton, eds, *Forensic Psychology* (Chichester: Blackwell Publishing Ltd, 2010), ch 4, p 47. After today, however, will criminal trials increasingly become a battle of psychologists? Although a battle of psychologists may well be useful in contexts beyond the ken of the ordinary juror, it seems considerably less useful in the context of making commonsense credibility determinations-- exactly the type of determinations that we

21

have always before entrusted to the jury. See *United States v Alexander*, 816 F2d 164, 169 (CA 5, 1987) ("Requiring the admission of the expert testimony proffered . . . would have established a rule that experts testifying generally as to the value of eyewitness testimony would have to be allowed to testify in every case in which eyewitness testimony is relevant. This would constitute a gross overburdening of the trial process by testimony about matters which juries have always been deemed competent to evaluate."). Indeed, making such commonsense credibility determinations has always been at the heart of the jury's role within our criminal justice system, and this core responsibility should not, in my judgment, be supplanted by a growing role for psychological expert testimony.[13]

## IV. CONCLUSION

Because I agree with the Court of Appeals that the trial court did not abuse its discretion by excluding the expert witness testimony, I would affirm the judgment of the Court of Appeals.

Stephen J. Markman

---

[13] The lead opinion contends that I have "exaggerated" its ramifications because its "holding is limited to the principle that a claim of a false confession is beyond the common knowledge of the ordinary person . . . ." *Ante* at 35-36. However, given its holding that "a claim of a false confession is beyond the common knowledge of the ordinary person," it is hardly "exaggerated" to question what other reasonably obvious matters of human behavior are, in the lead opinion's judgment, also "beyond the common knowledge of the ordinary person" and thus in need of expert testimony. Indeed, the lead opinion has already shown its inclination to be highly expansive regarding its "beyond the common knowledge of the ordinary person" standard by analogizing false confessions to the dependency of child sexual abuse victims and battered women on their abusers.